Filed 12/16/14  In re C.J. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re C.J., a Person Coming Under the Juvenile Court Law. | B255644 |
| | (Los Angeles County Super. Ct. No. DK01875) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| S.J., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, County Counsel, Dawyn Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

_____

Mother S.J. challenges the termination of juvenile court jurisdiction over her daughter C.J. without providing her with reunification services or determining whether there was a need for further court supervision. She further argues that the juvenile court erred in making its visitation order because the order gave C.J.'s father complete discretion over her visits with her daughter. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Seven-year-old C.J. lived with her mother S.J. and stepfather, and visited with her father Byron T. on weekends pursuant to an informal custody arrangement. In October 2013, a neighbor reported to the Department of Children and Family Services (DCFS) that S.J. had beaten C.J. with a belt, leaving welts. The reporting party said that she heard S.J. yelling and hitting C.J. at last once a week. C.J. told DCFS that her mother had beaten her five to eight times with a belt after she got in trouble at school for talking. C.J. had marks on her left shoulder, right shoulder, middle of the back, and left side of the forehead, and she said that her mother had hit her all over her body except for her legs and buttocks. S.J. told DCFS that she had stricken C.J. with a belt twice on her buttocks, and that the belt hit C.J. on her arms and back when she moved. She denied striking C.J. on the head. S.J. was arrested.

Byron T. immediately responded to a telephone call from DCFS and told DCFS he wanted custody of C.J. He promptly made his home available for DCFS inspection and met with staff at C.J.'s school to familiarize himself with her educational situation. Byron T. agreed to comply with juvenile court orders and DCFS case plans, and to protect C.J. from S.J.

DCFS subsequently filed a dependency petition under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b) alleging that S.J. had physically abused C.J. by striking her with a belt. C.J. was detained and released to her father. S.J. was given monitored visitation with C.J. pending the adjudication of the petition.

---

[1] All further statutory references are to the Welfare and Institutions Code.

C.J. remained with her father in the months leading up to the adjudication of the dependency petition. Tensions arose between the parents, leading Byron T. to ask that his address and telephone number remain confidential. S.J. had demanded that Byron T. make C.J. telephone her daily. Byron T. had responded that while C.J. was welcome to talk to her mother whenever she wanted, he would not accept S.J.'s demand of a daily call. "The next thing I know the mom was at my doorstep," he reported. S.J. claimed that she had come to the house because C.J. reported that there was fighting in the home and that Byron T. was yelling at her. S.J. admitted getting into an argument with Byron T. in front of C.J.

Byron T. asked that S.J. stay away from his home so that there would not be any conflict in C.J.'s presence. He described S.J.'s behavior as harassment and believed that S.J.'s hostility was directed toward Byron T.'s girlfriend, H.S. H.S. was helping Byron T. by taking C.J. to school and picking her up after school. After H.S. contacted C.J.'s teacher to address a problem that C.J. had in the classroom, S.J. informed C.J.'s school that H.S. was not permitted to drop her off, pick her up, or otherwise be involved in C.J.'s school life.

S.J. told DCFS that Byron T. and H.S. were engaging in violent confrontations in C.J.'s presence, leading to a broken window in the home. She said that C.J. reported fighting in the home and that her father yelled at her. She alleged that Byron T. let C.J. walk around with no underwear on and to smell like urine. Byron T. and H.S. reported that there was no violence in the home, and they explained that the issue with underwear was that C.J. had been uncomfortable at school because she was wearing underwear that was too small. They purchased new underwear for her and addressed the issue with the school. DCFS spoke with C.J., who reported that there were no physical altercations between her father and H.S. She had heard them talk loudly, but not so loudly that she could hear what they were talking about. C.J. was not afraid in the home. DCFS found no records of incidents of domestic violence at Byron T.'s home. DCFS concluded that the tension between the parents needed to be resolved for the sake of C.J.

S.J. enrolled in parenting education/anger management and individual counseling. Issues of physical discipline were addressed in the individual counseling intake and assessment but were not discussed every session. She completed the parenting education/anger management class. S.J. reported in January 2014 that she had enrolled in Parents Beyond Conflict, but that the classes did not begin immediately. In January 2014, DCFS recommended that S.J.'s visitation be changed from monitored to unmonitored to permit DCFS to assess the child in her care and to allow S.J. to practice the parenting skills she was learning.

The adjudication hearing was held in January 2014. S.J. pleaded no contest to the section 300, subdivision (a) allegation of the petition as amended to specify inappropriate discipline rather than physical abuse. The court found the subdivision (a) allegation true. The court did not proceed to disposition but set a further hearing in March 2014; in the meantime, it granted S.J. unmonitored visitation.

In early February 2014, S.J. was arrested on a felony charge after a domestic altercation with her husband that took place in the presence of S.J.'s newborn daughter. The police report indicated that S.J. accused her husband of hitting her, and he accused her of hitting him. The husband sustained a laceration on his chin from being stricken; S.J. had no visible injuries. She accused him of having been drinking that day, and he accused her of drinking daily. The newborn was detained in shelter care.

The social worker assigned to the newborn daughter's case spoke with S.J. S.J. admitted that she and her husband had an argument and denied domestic violence but admitted that she and her husband had each consumed a shot of liquor. S.J. announced that the police report of the incident was a lie but also that she had thought that her husband would be going to jail. She told DCFS that she was going to get C.J. back in March and that she had unmonitored visitation, and when the social worker advised her that this violent incident would likely result in a return to monitored visitation, she responded that DCFS could not do that because the current allegations were untrue. The social worker reported the following exchange: the worker explained "that DCFS has to ensure the safety of the children and now that she has been arrested for a violent crime of

4

domestic violence DCFS has to consider the risk factor of the children. Mother stated that her child was not involved and had nothing to do with the incident. [The social worker] informed the mother that when domestic disputes occur it places the children at risk of physical abuse and being emotionally affected. Mother stated that it does not."

On March 4, 2014, in the criminal proceedings arising from beating C.J. with the belt, the criminal court issued a three-year protective order for C.J. that required S.J. to stay away from C.J. except as necessary for the safe exchange of children pursuant to family, juvenile, or probate court orders. Accordingly, DCFS recommended that juvenile court jurisdiction be terminated with C.J. placed in her father's custody.

On March 17, 2014, the court declared C.J. a dependent child of the court. With regard to disposition, S.J. requested reunification services, and Byron T. requested that the court award him custody and terminate jurisdiction over C.J. Counsel for C.J. and her infant half-sister submitted on the recommendation to close the case with a family law order. The court then terminated jurisdiction over C.J., staying its order pending the resolution of a visitation plan. The court noted that it had no power over the criminal proceedings involving S.J. and explained, "[W]e're a court of limited jurisdiction in dependency. We're supposed to ensure the safety of the children, do the best that we can with respect to providing services and protection, and then we are to get out. And in this case, even if I wanted to I couldn't provide the type of relief that [counsel for S.J.] is looking for here because it's in the hands of the criminal court. So I will follow [the] Department's recommendation and will terminate jurisdiction on the basis that the Department has recommended." S.J. was given monitored visitation with C.J.

On March 28, S.J. attempted to cause the criminal court to change its protective order. She represented to the criminal court that she had been given unmonitored visitation with C.J., that she was on the brink of regaining custody, and that she just needed the order changed. The commissioner refused to change the order and advised S.J. that the dependency court could modify the order for visitation and that there was no need for the criminal court to act; it would follow the dependency court's lead.

On April 1, 2014, the juvenile court found that C.J. was in the custody of Byron T., "a nonoffending and capable parent." The court continued, "So the court finds that the conditions that justified us taking jurisdiction can be terminated, was terminated actually on 3-17 and just stayed to get a visitation plan. [¶] The court finds that jurisdiction to be terminated." The court entered a family law order giving S.J. visitation a minimum of two times per week, one hour per visit. The court ordered that the visits be monitored by a mutually agreed upon monitor, with Byron T. responsible for ensuring that a monitor is available. S.J. appeals.

## DISCUSSION

### I. Termination of Juvenile Court Jurisdiction

S.J. argues on appeal that the juvenile court erred in terminating jurisdiction over C.J. without affording S.J. reunification services. Section 361.2 provides that when a noncustodial parent requests custody of a child removed from the custodial parent, the court must place the child with the noncustodial parent unless doing so would be detrimental to the child. (§ 361.2, subd. (a).) At that point, the juvenile court has the discretion to choose from three statutory options. The court may: grant legal and physical custody of the child to the noncustodial parent and terminate jurisdiction over the child (§ 361.2, subd. (b)(1)); order that the noncustodial parent assume custody subject to juvenile court supervision, which may include reunification services for the formerly custodial parent and/or services for the parent who is assuming custody (§ 361.2, subd. (b)(3)); or grant the noncustodial parent custody subject to juvenile court jurisdiction and require that a home visit be conducted within three months, after which time the court may exercise either of the other two options (§ 361.2, subd. (b)(2)). Before terminating juvenile court jurisdiction, the juvenile court must conclude that continuing court supervision is no longer necessary. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134.)

Here, the juvenile court chose the first option, giving Byron T. custody of C.J. and terminating jurisdiction. The determination whether to terminate juvenile court

jurisdiction is reviewed for an abuse of discretion, and the factual question of whether continued court supervision is necessary is reviewed for substantial evidence. (See *In re Austin P*., *supra*, 118 Cal.App.4th at pp. 1134-1135 [reviewing supervision determination for substantial evidence and decision to continue jurisdiction for an abuse of discretion].)

Here, there was no abuse of discretion in terminating juvenile court jurisdiction and substantial evidence supported the determination that continuing court supervision was not necessary. Byron T. had been a noncustodial parent, but he had been a part of his child's life prior to the dependency proceedings: C.J. visited him on weekends pursuant to the parents' informal custody arrangement, and he had paid child support to S.J. prior to assuming custody of C.J. Byron T. expressed a desire to take C.J. as soon as he learned of the dependency proceedings, and he then demonstrated that he was a responsible and capable parent. He immediately met with staff at her school to ensure a smooth academic transition with his assumption of custody. He was open and forthcoming with DCFS, and DCFS never expressed concerns about C.J.'s well-being in his care. Although DCFS observed tensions between Byron T. and S.J. that required resolution, C.J. felt safe with her father. At the time of the jurisdictional hearing, C.J. had been residing with her father for five months without any substantiated incident or significant concern for her welfare. The juvenile court did not err in concluding that continuing court supervision was not necessary and that juvenile court jurisdiction should be terminated upon the grant of custody to Byron T.

S.J., however, argues that the court abused its discretion because it did not grant her reunification services prior to terminating jurisdiction. Because the dependency system is intended to provide safety and protection for children and to ensure their well being (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 42-43), and because custody determinations are to be based on the best interests of the child (*In re Noe F.* (2013) 213 Cal.App.4th 358, 368), she proposes that a court may only terminate jurisdiction without first providing reunification services if this is in the minor's best interests. While these general principles are accurate, they do not support S.J.'s claim that the juvenile court must provide reunification services at the point of making orders under section 361.2,

7

subdivision (b) unless it finds the termination of jurisdiction without such services is in the minor's best interests. Rather, as we have already explained, section 361.2 affords the juvenile court the discretion to choose among the three options for placement and further proceedings. It does not establish a preference for any of those options or establish a requirement that the court find any option not to be in a child's best interests before selecting another option.

S.J. argues that the court's order was an abuse of discretion because she was the only parent C.J. had ever known; she loves her daughter; C.J. was happy, healthy, and strongly bonded to her; and C.J. wanted to return to her mother. She downplays Byron T.'s role in C.J.'s life and asserts that there were concerns about domestic violence in his home, although DCFS did not uncover any violence in its investigation into S.J.'s claims of domestic violence at Byron T.'s home. She blames the juvenile court for "effectively destroy[ing] the family unit" with its order granting custody of C.J. to Byron T. and terminating juvenile court jurisdiction, when in fact S.J.'s inappropriate discipline necessitated reconfiguration of the family unit by requiring the removal of C.J. from her custody. None of these arguments establish a need for continuing court supervision or any abuse of discretion in electing to terminate juvenile court jurisdiction with C.J. in the custody of her father. C.J. was safely placed in the stable home of one of her parents, and there were no facts indicating that continued supervision of C.J. was necessary to ensure her well-being.

This case is unlike *In re Austin P.*, *supra*, 118 Cal.App.4th at page 1134, in which substantial evidence showed a need for continued juvenile court supervision where the dependent child and nonoffending parent had only sporadic contact over the prior decade; conflict existed among the adults involved in the matter and a risk existed that the child would be blamed for the dependency; the child needed individual and conjoint therapy, which would only occur if dependency supervision remained open; the nonoffending parent had not taken steps to protect the child from the offending parent, and the social worker needed to ensure that the child would be protected; DCFS had concerns about the relationship between the child's mother and his stepmother; the child, though happy with

8

the nonoffending parent, wanted to reunify with his mother, with whom he was bonded; and the offending parent had made progress on her reunification plan. Although C.J. may have been similarly bonded to the offending parent as the child in *In re Austin P.*, none of the circumstances here establish a need for continuing supervision.

Finally, S.J. argues that the juvenile court failed to exercise its discretion to determine whether C.J.'s physical and emotional well-being would be served by orders for ongoing juvenile court supervision and family reunification services. Here again, S.J. seeks to impose requirements on the juvenile court that exceed and differ from those imposed by section 361.2. The juvenile court did not abuse its discretion in terminating juvenile court jurisdiction, and substantial evidence supports the determination that continued court supervision was unnecessary. S.J. has not established error here.

## II.    Visitation Order

A juvenile court may delegate the responsibility for managing the details of visitation, including the time, place, and manner of visitation. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.) The court may not, however, delegate the absolute discretion to determine whether any visitation occurs. (*Ibid.*) In supplemental briefing, S.J. argues that the court's visitation order at termination constituted an improper delegation of judicial authority because it gave Byron T. complete discretion to determine whether any visitation took place between S.J. and C.J.[2]

The record does not support this claim. The court's visitation order granted S.J. monitored visitation with C.J. a "[m]inimum of 2 times per week, 1 hour per visit." Visits, the order provided, would be supervised by a "[m]utually agreed upon monitor; Father to ensure a monitor is available." Clearly Byron T. was not given complete discretion to determine whether visitation occurred. He was obligated to make C.J. available for visits with her mother twice a week, for an hour per visit, and he was

---

[2]    County counsel argues that S.J. forfeited this argument by failing to object to the visitation orders when entered. Although there was no objection to the order when it was entered, S.J. did personally express to the court concern about obtaining Byron T.'s cooperation in selecting a monitor.

required to ensure that a monitor was available. The record simply does not bear out S.J.'s claim that "the order effectively left father with a veto power over visits" by "rejecting all of mother's suggestions for a monitor." We therefore conclude that the visitation order is not an improper delegation of authority to determine whether any visitation occurs. Should a dispute arise over the selection of monitors for the visits, S.J. may seek a family law order to establish appropriate monitors for visitation.

## DISPOSITION

The judgment is affirmed.


ZELON, J.

We concur:


WOODS, Acting P. J.


SEGAL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.